
# Department of Justice


EXHIBIT
2
1: 21 - cr - 48

STATEMENT OF THE
U.S. DEPARTMENT OF JUSTICE

BEFORE THE

COMMITTEE ON THE JUDICIARY
UNITED STATES SENATE

FOR A HEARING ENTITLED

EXAMIING FEDERAL SENTENCING
FOR CRACK AND POWDER COCAINE

PRESENTED

JUNE 22, 2021

Statement of the
U.S. Department of Justice
Before the United States Senate
Committee on the Judiciary
For a Hearing entitled
"Examining Federal Sentencing for Crack and Powder Cocaine"
June 22, 2021

## Introduction

Mr. Chairman, Senator Grassley, distinguished members of the Committee — thank you for holding this hearing and for giving the Department of Justice (the Department) the opportunity to appear before you today to share our views on the "Eliminating a Quantifiably Unjust Application of the Law Act" or the "EQUAL Act." The Department strongly supports the legislation, for we believe it is long past time to end the disparity in sentencing policy between federal offenses involving crack cocaine and those involving powder cocaine. The crack/powder sentencing disparity has unquestionably led to unjustified differences in sentences for trafficking in two forms of the same substance, as well as unwarranted racial disparities in its application. The sentencing disparity was based on misinformation about the pharmacology of cocaine and its effects, and it is unnecessary to address the genuine and critical societal problems associated with trafficking cocaine, including violent crime.

The U.S. Sentencing Commission brought this issue to the attention of the country in 1995, when it issued the first of several reports laying out in great detail the research around cocaine, its forms, routes of administration and effects, the marketing and distribution of cocaine and its public health issues, and the crime associated with cocaine trafficking.[1] The Commission's data revealed for the first time that African-Americans accounted for 88 percent of federal crack cocaine distribution convictions in 1993, and that the sentences of those convicted of crack cocaine offenses were far more severe than for those traffickers involved in similar quantities of powder cocaine. After careful and comprehensive study of the issue, the Commission concluded that sentences for all forms of cocaine trafficking needed to be strong to address the genuine harms caused by such trafficking, but that the disparate treatment of crack and powder cocaine in federal sentencing policy was not justified. In April of 1995, the Commission recommended that the disparity be eliminated.

The Department believes it is long past time to accept the Commission's 1995 recommendation. There have been important steps taken in the intervening years to reduce the disparity, but a disparity remains. As Arkansas Governor, former Congressman, and former Administrator of the Drug Enforcement Administration Asa Hutchinson recently wrote in an opinion piece, there is no worthier cause than preserving

---

[1] U.S. Sentencing Commission, *Special Report to Congress, Cocaine and Federal Sentencing Policy* (February 1995).

our country's founding principle: that all are treated equally under the law.[2]  Governor Hutchinson urged passage of the EQUAL Act to end what he called "an old wrong."  The EQUAL Act has been endorsed by Democrats and Republicans, conservatives and liberals, senators and representatives.  These legislators know that our justice system must have the trust and confidence of the American people to be effective.  And a prerequisite for that is for our criminal and sentencing laws to be predictable, fair, effective, and not result in unwarranted racial and ethnic disparities.

The Department urges this Committee and the Congress as a whole to pass the EQUAL Act and to send it to President Biden for his signature.  The disparity in federal cocaine sentencing policy has been the most visible symbol of racial unfairness in the federal criminal justice system for almost 35 years, and it is time to eliminate it.

In the remainder of this statement, we describe why now is the time to enact the EQUAL Act – from the perspective of both fundamental fairness and public safety.

### Federal Drug Sentencing Policy

Criminal and sentencing laws, when crafted justly and through data-driven methods, provide both notice to the public of prohibited conduct and the consequences of engaging in such conduct.  When crafted effectively, they are also practical and effective tools for law enforcement, prosecutors, and judges to hold those who commit crimes accountable, deter future crime, and help make our communities safer.  Just *and* effective federal sentencing is critical to disrupting and dismantling the threat posed by drug trafficking organizations that too often plague our nation's streets: it is vital in the effort to reduce violent crime, child exploitation, sex trafficking and financial fraud; and it is essential to building trust and confidence in law enforcement and criminal justice.

Public trust and confidence are necessary elements of an effective criminal justice system – our laws and their enforcement must be fair and perceived as fair.  Unfairness, or the perception of unfairness, undermines governmental authority in the criminal justice process.  It leads victims and witnesses of crime to think twice before cooperating with law enforcement, tempts jurors to ignore the law and facts when judging a criminal case, and draws the public into questioning the motives of governmental officials and whether racism is at the heart of governmental systems.  When 77.1% of crack convictions in 2020 impact only members of a particular race or ethnicity—in this case Black people, who are thus disproportionally subject to the persisting sentencing disparity—that racial disparity greatly undermines fairness.[3]

---

[2] Governor Asa Hutchinson, *Gov. Asa Hutchinson: It's time to fix an old wrong and end the disparity between crack and cocaine offenses*, Fox News (June 8, 2021), https://www.foxnews.com/opinion/end-crack-cocaine-offenses-gov-asa-hutchinson.
[3] U.S. Sentencing Commission, *Quick Facts, Crack Cocaine Trafficking Offenses*, 2021, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Crack_Cocaine_FY20.pdf.

This Administration has already begun reviewing various criminal justice policies to bring about reforms that will both ensure that our law enforcement officers and prosecutors have the tools they need, not only to effectively respond to crime and help promote public safety, but also simultaneously to root out systemic problems, including unwarranted disparities in the criminal justice process.

A critical place to reform – and strengthen – criminal justice is federal cocaine sentencing policy. The EQUAL Act will do so, and that federal sentencing will more justly and effectively address dangerous drug trafficking across the country.

A. *Federal Sentencing Policy for Drug Trafficking Offenses*

Current sentencing policy for drug trafficking offensesf has its foundation in the Anti-Drug Abuse Act of 1986 ("the 1986 Act"). That statute established maximum and mandatory minimum penalties for persons convicted of trafficking in certain controlled substances. The 1986 Act pegged the mandatory minimums to specific quantities of drugs distributed. The quantities triggering the 1986 Act's mandatory minimum penalties differed for different drugs and in some cases for different forms of the same drug. The statute treated powder cocaine differently from crack cocaine by establishing what has come to be known as the 100-to-1 quantity ratio between the two forms of cocaine. In other words, in the 1986 Act, it took one hundred times as much powder cocaine as crack cocaine to trigger the same mandatory penalties. Under the 1986 Act, a person convicted of selling 5 grams of crack cocaine was treated the same as someone selling 500 grams of powder cocaine. The Sentencing Commission incorporated the quantity-based sentencing levels from the statute, including the 100-to-1 crack/powder disparity, into the federal sentencing guidelines.

There is a rational basis for tying penalties to drug type and quantity. An offense involving a larger quantity of a particular drug is ordinarily more serious than an offense involving a smaller quantity of the same drug. And different controlled substances can have different pharmacological effects in different quantities. So pound-for-pound, ounce-for-ounce, and gram-for-gram, under federal law and the sentencing guidelines, cocaine trafficking is generally sentenced more severely than marijuana trafficking; heroin trafficking is sentenced more severely than cocaine trafficking; and fentanyl trafficking is sentenced more severely than heroin trafficking.

But it is also critical to recognize that the statutory quantity-based triggers for drug trafficking penalties in federal law – and for base offense levels in the federal sentencing guidelines – are just part of sentencing policy for federal drug trafficking offenses. In addition to the quantity-based elements, statutory penalties and sentencing guidelines for drug traffickers are increased based on various aggravating factors present in particular crimes. For example, the guideline ranges are increased for those offenders convicted of possessing a gun in connection with a drug trafficking offense, for those who use a gun during the offense, for those involved in violence or who made a credible threat of violence, for those whose offenses result in death or serious bodily injury, for those with prior convictions for drug offenses, for those who are organizers or managers

of significant drug trafficking organizations, and for many other reasons. Likewise, penalties may be reduced based on factors including assistance with law enforcement, minor or minimal role in the offense, or other mitigating factors.

This is a critical point, because there are indeed differences in the ways certain drugs are manufactured and trafficked. Some forms of drug trafficking may correlate with higher rates of accompanying weapon possession, violence, or other aggravating factors. And we believe that those differences are often significant enough that they should be accounted for in sentencing policy. But those differences (unlike differences inherent in the drug's pharmacology) can be addressed through statutes and guidelines targeting violence, weapons, culpability level, and the like, rather than through quantity-based penalties. This allows for targeting longer prison sentences for offenders whose conduct warrants them, and mitigated sentences for those that do not, rather than being overinclusive and sweeping in those for whom such sentences are unnecessary, unjust, and costly.

## B. *The Science of Cocaine: One Drug, Two Forms*

As the Sentencing Commission pointed out in 1995, when crack cocaine first appeared on U.S. streets, there was a belief that it was more dangerous than powder cocaine. That belief drove Congress to treat crack and powder cocaine differently.[4] But even by 1995, and especially in the years since, the evidence has demonstrated that powder cocaine and crack cocaine produce similar physiological and psychological effects once they reach the brain. Whether in its powder or crack form, both types of cocaine are addictive, and both pose serious health risks.

According to the National Institute on Drug Abuse (NIDA), the key difference in cocaine's effects depends on how it is administered – by snorting, smoking, or injecting. The intensity and duration of cocaine's effects, in any form, depend on the speed with which it is absorbed into the bloodstream and delivered to the brain.[5] Smoking or injecting cocaine produces a quicker high than snorting it. For that reason, the user who is smoking or injecting the drug can potentially become addicted faster than the user who is snorting the same substance. Indeed, some studies have found that injected cocaine is absorbed into the bloodstream as rapidly as smoked cocaine. The point is that differing methods of administration are what impact how rapidly powder or crack cocaine affects the body, not pharmacological differences between the two forms of the drug.

The research is clear that crack and powder cocaine are two forms of the same substance, and powder cocaine can readily be converted into an equivalent amount of a substance containing crack cocaine. Indeed, under current law, a high-level dealer caught with three-quarters of a pound of powder cocaine that he plans to convert into an equivalent amount of crack cocaine may face a lower sentence than the street-level dealer

---

[4] U.S. Sentencing Commission, *Special Report to Congress, Cocaine and Federal Sentencing Policy* (February 1995).
[5] National Institute on Drug Abuse, *Cocaine DrugFacts*, April 2021, https://www.drugabuse.gov/publications/drugfacts/cocaine.

4

caught with an ounce of already-converted crack cocaine. That makes little sense and is not fair. It is for this reason that so many see the injustice in differing sentencing policy based on the form of the drug. And it was for this reason that Congress in 2010 enacted the bipartisan Fair Sentencing Act that reduced the disparity from 100-to-1 to 18-to-1. We are grateful for Congress's work in enacting the Fair Sentencing Act and the First Step Act, which made the reduced disparity retroactive.

## C. *Unwarranted Racial Disparities*

While these were welcome legislative steps, the racial disparities involved in federal cocaine sentencing policy persist, as do the unnecessarily severe sentences. The Sentencing Commission reports that in fiscal year 2019, African-Americans accounted for 81% of federal crack cocaine convictions, and in fiscal 2020, they accounted for nearly 77% of convictions.[6] Those convictions led to prison terms that were far longer than they would have been for equivalent amounts of powder cocaine. During FY 2020, for example, federal crack cocaine offenders were sentenced to an average of 74 months, while the average powder offender was sentenced to 66 months; meanwhile, the median drug quantity for these crack offenders was 44 grams (less than 2 ounces), and the median drug quantity for powder cocaine was 5,200 grams, about 11 ½ pounds. We are comparing a mean to a median because of technical limitations with the data, but the difference is obvious.

These racially disparate impacts of the crack-powder sentencing disparities are also evident through reflecting on the current federal prison population. As of March 2021, Sentencing Commission data shows that 87.5% of the individuals serving sentences in the federal Bureau of Prisons for drug trafficking offenses, where the primary drug involved was crack cocaine, were Black. That means almost 90% of the federal inmates still suffering from the effects of the disparity, today, are Black.[7]

Higher penalties for crack are also not necessary to protecting public safety. As noted, the Sentencing Guidelines provide for specific enhancements that *are* tied to violence and public safety—such as additional enhancements for drug-trafficking that involves weapons, or additional penalties for having a leadership role in a trafficking organization. All that is done by punishing the same amount of crack cocaine more harshly than the same amount of powder cocaine is the perpetuation of unwarranted sentencing disparities. And in creating the Sentencing Guidelines, Congress explicitly required that the guidelines provide fairness in sentencing and reduce unwarranted sentence disparities.[8]

## D. *The Drug Trafficking Threat*

We want to make clear our view that cocaine and other illegal drugs pose serious risks to the health and safety of Americans. Cocaine is a dangerous and addictive drug,

---

[6] U.S. Sentencing Commission, *Sourcebook of Federal Sentencing Statistics* (2020, 2021).

[7] U.S. Sentencing Commission, data provided to Department of Justice as of June 21, 2021.

[8] 28 U.S.C. § 994 (2021).

and its use and abuse can be devastating to families regardless of economic background or social status. Statistics on drug use, emergency department visits, violence, and many other indicators tell the story of tremendous harms caused by the illicit use of drugs, including cocaine. We must never lose sight of these harms, their impact on our society, and our responsibility to reduce illicit cocaine use.[9]

Moreover, transnational criminal organizations and drug trafficking organizations, have long posed an extremely serious public health and safety threat to the United States. The Department is committed to rooting out these dangerous organizations, and we are grateful to our law enforcement professionals who each day face grave dangers as they try to disrupt and dismantle these threats and improve public safety. Whether it is transnational drug cartels moving large quantities of powder cocaine into and through the United States, or the local distribution of crack in an American community, we aim our resources on dismantling these enterprises – and disrupting the flow of money both here and abroad – to help protect the American public.

In the fight against illegal drugs, we also recognize that vigorous drug interdiction must be complemented with a heavy focus on the prevention and treatment of substance use disorder. Today, many of those who come in contact with the criminal justice system in this country struggle with drug addiction, and many do not receive the treatment they need. When individuals returning from prison to their communities continue to struggle with addiction, they have a greater tendency to re-offend, as well as to feed the lucrative underground market for drugs.[10] We cannot break this cycle of recidivism without increased attention to prevention and treatment, as well as comprehensive prisoner reentry programs that promote sustained recovery.

It is only through a balanced and sophisticated approach – combining enforcement with robust prevention and treatment efforts – that we will be successful in stemming both the demand and supply of illegal drugs in our country. Strong and predictable sentencing laws are part of this balanced approach.

E. *Why the EQUAL Act Should Be Enacted Now*

There are many reasons why we think the EQUAL Act should be enacted now. First, the crack/powder disparity is simply not supported by science, as there are no significant pharmacological differences between the drugs: they are two forms of the same drug, with powder readily convertible into crack cocaine. Second, as documented by the Sentencing Commission, the crack/powder sentencing differential is still responsible for unwarranted racial disparities in sentencing. Third, the higher penalties for crack cocaine offenses are not necessary to achieve (and actually undermine) our law enforcement priorities, as there are other tools more appropriately tailored to that end.

---

[9] National Institute on Drug Abuse, *Cocaine Research Report* (2020),
https://www.drugabuse.gov/publications/research-reports/cocaine/what-cocaine.
[10] National Institute on Drug Abuse, *Overview of the Criminal Justice Drug Abuse Treatment Studies (CJ-DATS) Phase I & II*,
https://www.drugabuse.gov/research/nida-research-programs-activities/justice-system-research.

When crack cocaine offenses are associated with violence, there are provisions in the law and in the guidelines to address that violence and to ensure that those responsible are held accountable. When individuals serve as leaders of drug trafficking organizations or recruit young people into their conspiracies, federal law will direct higher penalties. And when repeat offenders don't get the message and continue to traffic, penalties are increased.

There are those who claim the current cocaine penalty structure (resulting in disparities) is justified because it accounts for a greater degree of violence and weapons involvement associated with some crack offenses, and because crack can be potentially more addictive than powder, depending on the usual method of use.

The Department shares these concerns about violence and guns used to commit drug offenses and other crimes associated with such offenses. We recognize that data suggest that weapons involvement and violence in the commission of cocaine-related offenses are generally higher in crack versus powder cases. This is largely because crack cocaine is sold at the retail-level, and violence is more often associated with retail sales. We believe that violence associated with any offense is a serious crime and must be addressed, but the best way to address drug-related violence is to ensure that increased penalties are meted out when those circumstances are present. We support the application of sentencing enhancements, under the guidelines, for those who use weapons in drug trafficking crimes, or for those who use minors to commit their crimes, or for those who injure or kill someone in relation to a drug trafficking offense, and the like. But we should not increase the penalties for an entire class of offenders, and there should not be a discount for trafficking in powder cocaine rather than crack cocaine.

Moreover, recent history has shown that even when penalties are reduced, many who are arrested continue to cooperate with the government and provide substantial assistance in the investigation and prosecution of others. The Sentencing Commission found that the rate of guilty pleas, and of substantial assistance departures, both remained largely constant before and after the guideline base offense levels for crack were lowered in 2007. Today, substantial assistance occurs slightly less often in crack cocaine trafficking cases than in powder cocaine trafficking cases and less frequently than in methamphetamine trafficking cases, but more frequently than in marijuana trafficking cases and more frequently than in all other federal criminal cases generally. Federal crack defendants continue to plead guilty in more than 95% of cases. In our experience at the Department, the changes in the law to date have not thwarted federal prosecutors in bringing crack prosecutions against significant dealers.

The proposed EQUAL Act would be an effective means of eliminating the persisting, unjust sentencing disparity that is still baked into federal law. Department prosecutors have applied the laws as passed by Congress to address serious crime problems in communities across the nation. But the Department—along with numerous other law enforcement leaders who have spoken out against the powder-crack disparity—believes that the most effective drug enforcement strategy is to deploy federal resources to disrupt and dismantle major drug trafficking organizations, especially when they use

7

violence to terrorize neighborhoods. That is our objective, and the crack-powder sentencing disparity does not help us achieve it.

### F. *Retroactivity*

We not only support the provisions of the EQUAL Act that will eliminate the existing crack/powder disparity, we also support making this change retroactive. Unlike the Fair Sentencing Act, the EQUAL Act is explicit that it applies "to any sentence imposed after the date of enactment of this Act, regardless of when the offense was committed." It also has an explicit retroactivity provision, but retroactive relief under the Equal Act is not automatic. Rather, a federal judge would evaluate each individual's motion in light of the statutory sentencing factors, including the need to protect the public.

Applying the changes retroactively will ensure that no crack cocaine offender will serve a sentence greater than necessary.

We support retroactivity because it is the right thing to do, and because evidence shows that previous instances of retroactive penalty reductions did not impact public safety. The Sentencing Commission has twice studied recidivism among crack offenders who received retroactive sentencing reductions and concluded that offenders released early did not have higher rates of recidivism than crack offenders who had served their full sentences. Furthermore, retroactive relief under the Equal Act would not automatic; rather a federal judge would evaluate each individual's motion in light of the statutory sentencing factors, including the need to protect the public.

Passing the EQUAL Act would also help to ensure that all crack cocaine offenders who were negatively affected by the old 100-to-1 crack-to-powder ratio receive the opportunity for a sentence reduction. The Supreme Court recently ruled in *Terry v. United States* that low-level crack cocaine traffickers are ineligible for a sentence reduction under the provision of the First Step Act that authorized retroactive application of the Fair Sentencing Act. Under the Supreme Court's ruling, and according to Sentencing Commission data, approximately 230 crack cocaine offenders who are still serving sentences under the pre-Fair Sentencing Act statutory and Guidelines regime are ineligible for a sentence reduction, whether or not their sentence was affected by the 100-to-1 ratio. Under the EQUAL Act, those defendants would get the chance to ask for a reduced sentence.

We support the bill's intent to make its changes retroactive. The Department looks forward to working with you on improving the technical aspects of the retroactivity provisions.

### Conclusion

For the reasons outlined above, the Department believes that the current federal cocaine sentencing structure is wrong and must be changed. It fails to reflect the

identical pharmacological properties of crack and powder cocaine, nature of the offenses involving the drug that cause the most harm, and the goal of sentencing only major traffickers to the most severe prison sentences. We believe that the current structure is unjust. Passing the EQUAL Act will help eliminate the sentencing disparity – in the quantity-based foundational sentences – between crack cocaine and powder cocaine.

As the history of this debate makes clear, there has been disagreement about whether federal cocaine sentencing policy should change, and, if so, how it should change. But the history also shows that members of both political parties, law enforcement, and community groups can all come together to find a policy that is fair and just, racially equitable, effective in promoting public safety, and addresses the real concerns around drug trafficking. This Administration and its components, including the Department and the Office of National Drug Control Policy, look forward to working with this Committee and members of Congress in both chambers to develop sentencing laws that are effective, smart, fair, and perceived as such by the American public. Our goal is to ensure that our sentencing system is predictable and even-handed, and as such, promotes public trust and confidence in our criminal justice system. Ultimately, we all share the goals of ensuring that the public is kept safe, reducing crime, and minimizing the wide-reaching, negative effects of illegal drugs. To begin this effort, Congress must pass the EQUAL Act.